UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
IN RE:                        )
JACALYN S. NOSEK, Debtor      )
                              )
_____)
                              )
AMERIQUEST MORTGAGE CO.;      )
ABLITT & CHARLTON, P.C.;      )   CIVIL ACTION
BUCHALTER NEMER, A            )   NO. 08-40095-WGY
PROFESSIONAL CORPORATION;     )
WELLS FARGO BANK, N.A.; and   )
WELLS FARGO BANK, N.A. AS     )
TRUSTEE FOR AMRESCO           )
RESIDENTIAL SECURITIES CORP.  )
MORTGAGE LOAN TRUST, SERIES   )
1988-2                        )
                              )
     Appellants,              )
                              )
          v.                  )
                              )
                              )
UNITED STATES BANKRUPTCY      )
COURT FOR THE DISTRICT OF     )
MASSACHUSETTS and JACALYN     )
S. NOSEK,                     )
                              )
     Potentially Interested   )
           Parties            )
_____)
```

MEMORANDUM AND ORDER

Young, D.J.                                          May 26, 2009

**I. INTRODUCTION**

    Oscar Wilde once said "It's not whether you win or lose, it's how you place the blame."[1] This case presents the unedifying spectacle of a litigant and its lawyers engaging in egregious misrepresentations and, now that they have been

---

[1] Quoted in Daniel B. Meyer & Edward C. Eberspacher IV, Legal Malpractice and the Liability of Successor Counsel, For the Defense 16 (May 2009).

sanctioned for such misconduct, scrambling to pass the blame on to others much like the iconic Thomas Nast cartoon of The Tweed Ring. Thomas Nast, Who Stole the People's Money?, Harper's Weekly, Aug. 19, 1871, at 764 (available at www.harpweek.com/ 09Cartoon/BrowseByDateCartoon-Large.asp?Month=August&Date=19).

This case has been here before. See In re Nosek, 354 B.R. 331 (D. Mass. 2006). Further proceedings followed. Thereafter, in accordance with the mandate of the First Circuit, the Bankruptcy Court vacated its substantive rulings in In re Nosek, 363 B.R. 643 (Bankr. D. Mass. 2007) (Rosenthal, J.), rev'd 544 F.3d 34 (1st Cir. 2008). The Bankruptcy Court, however, was not ordered to nor did it vacate its April 25, 2008 Order for sanctions. In that comprehensive and thorough 17 page order,[2] the Bankruptcy Court sanctioned: (1) Ameriquest Mortgage Company ("Ameriquest"), the servicer of the loan in question, $250,000; (2) Ablitt & Charlton, P.C. ("Ablitt"), Ameriquest's counsel in the bankruptcy proceedings, $25,000; (3) Buchalter Nemer, P.C. ("Buchalter"), Ameriquest's national counsel, $100,000; and (4) Wells Fargo Bank, N.A. ("Wells Fargo," p/k/a "Norwest Bank,

---

[2] The meticulous care that went into the decision of the bankruptcy judge is worthy of comment. Although the legal press portrays the sanctions imposed by the bankruptcy judge as something of an aberration, see Julia Reischel, "The 'straight talker,'" 37 Mass. Lawyers Weekly at 1 (May 4, 2009), recent scholarship suggests that attorney misconduct frequently goes unsanctioned simply because it requires the judge to take too much time away from the constant pressure to "move the business." See Gregory Thomas Betehart, Contempt of Court: The Obersevation of Pre-Trial Hearings (on file with author).

2

Minnesota, N.A."), the trustee of the securitization entity which holds the loan, $250,000.[3]  All four parties have appealed.

**A.   Background**

On November 25, 1997, the Debtor, Jacalyn Nosek, took a mortgage on her principal residence to secure a note payable to Ameriquest.  Five days later, Ameriquest assigned the note and mortgage to Wells Fargo as trustee for Amresco Residential Securities Corporation Mortgage Loan Trust, Series 1998-2 (the "Trust").  This assignment was recorded on May 22, 2000. Memorandum of Decision Regarding Order To Show Cause (the "Order") at 1-3 [Doc. No. 1-4].  As part of the assignment, Ameriquest signed a Pooling and Servicing Agreement with Wells Fargo and Amresco Residential Securities Corporation (the "Agreement").  The Agreement provides that Ameriquest "in its own name . . . is  hereby authorized and empowered and this subsection shall constitute a power of attorney to carry out its servicing and administrative duties hereunder, on behalf of itself, the Owners and the Trust or any of them."  The Agreement explicitly states that such duties include the collection of payments and the institution of foreclosure proceedings.  The Agreement also states that Wells Fargo as trustee is acting "not in its individual capacity but solely as Trustee under this Agreement."

---

[3] The Bankruptcy Court initially sanctioned Attorney Robert C. Charlton $25,000, but later vacated this sanction on a motion for reconsideration.

Nosek filed for bankruptcy protection on October 2, 2002. On November 1, 2002, she filed schedules which listed a secured, disputed debt owed to Wells Fargo as trustee. The schedule also listed Ameriquest, representing Wells Fargo. Id. On March 31, 2005, Ameriquest assigned the servicing rights on the loan to AMC Mortgage Services. The trial for Adversary Proceeding 04-4517 began on November 28, 2005. At that time, while Ameriquest could be held accountable for its past behavior, it had no role with respect to the loan, a fact which was not disclosed to the Bankruptcy Court. Id. at 3-4.

Despite the fact that it had not held the loan since 1997 or serviced it since early 2005, Ameriquest and its attorneys made contrary representations. It filed a proof of claim and an amended proof of claim in 2002 and 2003 prepared by Buchalter, listing itself as creditor without any reference to the assignment of the loan and without attaching a copy of the power of attorney. It filed pleadings signed by the Ablitt attorneys in 2003 stating that it "is the holder of the first mortgage . . ." It filed an Answer signed by the Ablitt attorneys in 2005 admitting the allegation that it is the holder of the first mortgage. It conducted an eight-day adversary proceeding in 2006, with representation by Ablitt, without ever notifying the Bankruptcy Court that it was neither the holder nor the servicer of the note and mortgage. Id. at 4-5.

The Bankruptcy Court was apprised of Ameriquest's actual role only after it awarded $750,000 in emotional distress and

4

punitive damages to Nosek, and she brought an action for trustee process to collect the funds on July 27, 2007. Ameriquest, in its opposition to the trustee process action, stated in an affidavit that "Ameriquest merely collects these funds on behalf of their owners. It does not own these funds . . ." Id. at 2. This was the first time the Bankruptcy Court learned that Ameriquest was not the holder of the loan, contrary to Ameriquest's representations throughout the course of the bankruptcy case. Id. As a result of this disclosure, the complaint for trustee process was amended to add Wells Fargo as trustee and dismissed as to Ameriquest. Id. at 3. The Bankruptcy Court then issued an Order to Show Cause why sanctions should not be imposed for the misrepresentations; reviewed the briefs; heard argument; and took the matter under advisement. Id. at 7. It eventually issued the Order, noting that "those parties who do not hold the note or mortgage and who do not service the mortgage do not have standing to pursue . . . actions arising from the mortgage obligation." Id. at 8. Therefore, it applied its analogue of Federal Rule of Civil Procedure 11, viz., Federal Rule of Bankruptcy Procedure 9011 to impose the sanctions at issue herein.

**B.   Federal Jurisdiction**

Federal Jurisdiction is proper in this case under 28 U.S.C. § 158(a), which grants jurisdiction to this Court for appeals from orders of the Bankruptcy Court.

**II. ANALYSIS**

"The purpose of Rule 9011 is to deter baseless filings in bankruptcy and thus avoid the expenditure of unnecessary resources by imposing sanctions on those found to have violated it." In re MAS Realty Corp., 326 B.R. 31, 37 (Bankr. D. Mass. 2005). Under Rule 9011(b), an attorney who signs "a pleading, written motion, or other paper" certifies that "the allegations and other factual contentions have evidentiary support..." Representations may be based on information and belief "formed after an inquiry reasonable under the circumstances." The standard is "an objective standard of reasonableness under the circumstances." Cruz v. Savage, 896 F.2d 626, 631 (1st Cir. 1990). The Bankruptcy Court may issue sanctions against parties, firms, or individual attorneys sua sponte provided that it enters an order to show cause. Fed. R. Bankr. P. 9011(c)(1)(B). If sanctions are imposed, the amount must "be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Id. at (c)(2). Because Rule 9011 is the analogue of Rule 11 of the Federal Rules of Civil Procedure, "Rule 11 jurisprudence is largely transferable to Rule 9011 cases." In re D.C. Sullivan Co., 843 F.2d 596, 598 (1st Cir. 1988). The imposition of sanctions is reviewed for abuse of discretion. Anderson v. Beatrice Foods Co., 900 F.2d 388, 393 (1st Cir. 1990). The substantive standard for a Rule 11 violation, and by extension a Rule 9011 violation, is the same regardless of whether the court or opposing counsel invoked the

6

rule. <u>Young</u> v. <u>City of Providence</u>, 404 F.3d 33, 39-40 (1st Cir. 2005).

### A. The Litigants

#### 1. Ameriquest

Ameriquest made several arguments below which the Bankruptcy Court addressed in its Order. First, the Bankruptcy Court rejected the argument that Ameriquest's purported lack of bad faith affected the analysis. "Because the standard to be applied is an objective one, the Court may quickly dispatch this argument. Intent is irrelevant." Order at 10. Additionally, the Bankruptcy Court ruled that the debtor's apparent knowledge of the assignment, as indicated by her 2002 schedules, was also irrelevant. "It is the creditor's responsibility to keep a borrower and the Court informed as to who owns the note and mortgage and is servicing the loan, not the borrower's or the Court's responsibility to ferret out the truth." Order at 11. Further, the Bankruptcy Court did not accept Ameriquest's contention that the award would not have any deterrent value since Ameriquest is no longer in the loan servicing business. Ameriquest "ignores the fact that it could reenter the residential mortgage arena in the future. Moreover, sanctions are designed to deter future actions . . . [by] others similarly situated." Order at 13 (internal quotations omitted). Finally, the Bankruptcy Court addressed Ameriquest's argument that the Pooling and Servicing Agreement gave Ameriquest license to file the proof of claim in its own name. By failing to file the power

7

of attorney with the proof of claim, the Bankruptcy Court found that Ameriquest violated Federal Rule of Bankruptcy Procedure 3001. "It is worth repeating as a warning to lenders and servicers that the rules of this Court apply to them. Their private agreements and the frenzied trading market for mortgages do not excuse compliance with the Bankruptcy Rules any more than they would justify ignoring the Bankruptcy Code." Order at 12.

On appeal, Ameriquest continues to press some of these arguments. Ameriquest argues that it did not violate Rule 3001 when it filed the proofs of claim. The rule requires that a proof of claim "conform substantially to the appropriate Official Form." The signature block of the Official Form directs the signer to "attach copy of power of attorney, if any." It is not clear whether a failure to attach the power of attorney negates substantial conformity. In its favor on this point, Ameriquest notes that the Massachusetts Local Bankruptcy Rules were amended to require a movant to identify "the original holder of the obligations secured by the security interest and/or mortgage and every subsequent transferee, if known to the movant, and whether the movant is the holder of that obligation or an agent of the holder." M.L.B.R. 4001-1(b)(2)(F). Such a requirement would be redundant if failure to do so violated Rule 3001. Ameriquest Mem. at 26 [Doc. No. 18].

Ameriquest also raises two new arguments on appeal. First, Ameriquest attacks the Bankruptcy Court's failure to justify the precise dollar amount of the sanctions. Second, it asserts that

8

the sanctions were a criminal punishment imposed without due process. Regarding the dollar amount, Ameriquest relies on <u>Vollmer</u> v. <u>Selden</u>, 350 F.3d 656 (7th Cir. 2003), which reversed a sua sponte Rule 11 award. In reaching that holding, the court noted that "absent extraordinary circumstances not shown here, sua sponte sanctions are generally limited to several thousand dollars." <u>Id.</u> at 663. The general rule is that the amount of the sanctions should be no more than is necessary to deter the behavior at issue. <u>See</u> <u>Navarro-Ayala</u> v. <u>Nunez</u>, 968 F.2d 1421, 1427 (1st Cir. 1992) (noting that "a monetary sanction aimed at deterrence is appropriate only when the amount of the sanction falls within the minimum range reasonably required to deter the abusive behavior"). The uncertainty inherent in such an endeavor makes it difficult for a party to demonstrate abuse of discretion. Indeed, as the record in this case demonstrates so well, "[e]xperience shows that in practice Rule 11 has not been effective in deterring abuses." Advisory Committee Notes to the 1983 Amendment to Fed. R. Civ. P. 11. Here, the judgment of the experienced bankruptcy judge concerning what is necessary to deter such misconduct in bankruptcy proceedings ought be respected. This Court does so.

Ameriquest's final argument, that the sanctions are a criminal penalty, is bereft of authority. Ameriquest cites <u>F.J. Hanshaw Enterprises, Inc.</u> v. <u>Emerald River Development, Inc.</u>, 244 F.3d 1128 (9th Cir. 2001), a case about inherent powers – not Rule 11 – for the proposition that an order directing payment to

9

the United States without an opportunity to purge is a criminal sanction. In F.J. Hanshaw, the Ninth Circuit held the Supreme Court's jurisprudence distinguishing civil from criminal contempt was applicable in the inherent powers context. 244 F.3d at 1137-38 (citing the Supreme Court's holding in International Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 829 (1994) that "[w]here a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge"). But there is no suggestion, from the Ninth or other Circuits, that such a test would apply in the Rule 11 or Bankruptcy Rule 9011 context. The due process required is precisely what the Bankruptcy Rules require and the Bankruptcy Court afforded: notice and an opportunity to be heard. See American Airlines, Inc. v. Allied Pilots Ass'n., 968 F.2d 523, 530 (5th Cir. 1992) (holding that "[t]he procedure followed by the court in imposing sanctions under Rule 11 must obviously comply with the requirement of due process. This requires adequate notice and an opportunity to be heard.")

Because Ameriquest was less than candid with the Bankruptcy Court, the sanctions award against it is upheld.

**2. Wells Fargo**

The Bankruptcy Court's sanction of Wells Fargo, however, exceeds the bounds of Rule 9011. Wells Fargo was not a party to the proceedings until December 5, 2007, two months prior to the Order to Show Cause. Wells Fargo had no role in any of the filings at issue. Moreover, the Bankruptcy Court held that Wells

Fargo's liability was not limited to its capacity as trustee. "That the note and mortgage were subsequently assigned to a trust holding a pool of notes and mortgages by Wells Fargo's predecessor, Norwest, is simply another example of the layers interposed between borrower and lender in today's marketplace. It cannot serve as a vehicle to deflect ultimate responsibility from Wells Fargo." Order at 17. The Bankruptcy Court's ruling that it "will not allow Wells Fargo or any other mortgagee to shirk responsibility by pointing fingers at their servicers," id., is *ultra vires*; Rule 9011 does not apply to an entity that is not a party, attorney, or law firm which signed a pleading. See In re Rainbow Magazine, 136 B.R. 545, 552-553 (9th Cir. 1992), overruled on other grounds by Lockary v. Kayfetz, 974 F.2d 1166 (9th Cir. 1992)(holding that the language of the rule precludes sanctions against a non-party non-attorney). Therefore, the Bankruptcy Court abused its discretion in sanctioning Wells Fargo and the sanction against it must be vacated.

**B.  The Lawyers**

After 43 years at the bar, the saddest thing about this case is the conduct of the lawyers – all the lawyers. A careful reading of the briefs in this case reveals only a single recognition that counsel did anything amiss in their misrepresentations to the Bankruptcy Court. There's blame aplenty, of course, each one blaming everyone else – including the hapless bankrupt homeowner. Only once, at the very end of

11

the Buchalter brief, looking back at the wreck of America's economy, does its counsel admit "In 2002, Buchalter could have – and perhaps....should have – identified Ameriquest in the proofs of claim."  Buchalter Mem. at 20 [Doc. No. 16].

How is it that our profession, the legal profession – which could have and should have strongly counseled against the self interested excesses that set up the collapse – instead has eagerly aided and abetted those very excesses?  How could we (all of us who profess to be lawyers) have fallen so low?

Perhaps the answer lies in a poignant and little known essay by the distinguished attorney Carl M. Sapers.

> By the 1980's, the generalist lawyer had been succeeded by specialized lawyers, each of whom, like the hedgehog, knew only one thing but knew it very well.
>     By the mid-1980's, we had all become "transactional" lawyers engaged to handle a particular problem.  We no longer were engaged to know about all of our client's legal problems.  The in-house counsel had that plenary knowledge.  We were no longer engaged to furnish wise judgment, but rather to solve a specific legal problem.
>     This development created in its train two significant changes: the wise counselor became a skilled technocrat; the traditional fiduciary became a vendor.  The narrow focus of legal assignments meant that lawyers no longer comprehended the quotidian concerns of the client, nor did they see the client whole.  Because the client chose its legal services on the basis of price, speed, and experience and cherry-picked what it thought the most appealing from several firms, the firms themselves had a diminished sense of loyalty to any client.
>     Perhaps, even more significantly, we as lawyers had lost that moral clarity that had characterized . . . practice . . . .
>
>                         ....
>
>   In February 1994, the Council of the Boston Bar rejected
>   ... proposed guidelines [concerning lawyer political
>   contributions], but proponents of the idea appealed to the
>   Large Law Firm Group, which met monthly in Boston to
>   discuss matters of mutual concern (while carefully

12

avoiding the exchange of information that might implicate the Sherman Act).

The response from that mighty body, composed of the managing partners of our largest firms, was: "If it is not illegal, why should we curtail what we are doing?" This constituted a new definition of legal ethics. We only stop at the water's edge of criminality.

....

The working day was extended; the expectation of billable hours grew by leaps among partners and by leaps and bounds among associates. With more time directed at specialized work, there was less time to be involved in community life and recreational or cultural pursuits. Dean Kronman of the Yale Law School, in his provocative study, *The Lost Lawyer: Failing Ideals of the Legal Profession*[4] describes law practice at its best as "the lawyer-statesman ideal," when clients sought lawyers for their wisdom and experience, not just their technical agility within a narrow area of law. Dean Kronman observes that "the increasing narrowness of large-firm practice must itself be viewed as a threat to the lawyer-statesman ideal."[5] He writes that lawyers' "imaginative powers shrink as the boundaries of their experience do."[6] The new devotion to billable hours had narrowed the breadth and scope of most lawyers' lives.

In the 1990s, the trajectory of practice was constant. More specialization, greater emphasis on billable hours, and more leveraging of increasing numbers of associates. Improving the bottom line was a guiding light in the management of large firms. Lawyers were sensitive to where their earnings ranked in the city, and for the first time partners jumped from firm to firm to improve their compensation. But then a sea change occurred: we who had habitually compared ourselves to our peers now began to compare ourselves to our clients.

Suddenly, Warren Buffet, Bill Gates, and Goldman Sachs became the standards against which we measured our compensation. With that comparison, another self-imposed barrier in our practice crumbled. Lawyers had kept a disinterested distance in order to claim a healthy objectivity in dealing with client problems; they were now prepared to take an equity stake in their clients.

....

---

[4] Harvard University Press, 1993.

[5] Id. at 304.

[6] Id. at 307.

>     [Today] diversity is remarkable.  The partners come
> from a multitude of law schools; Harvard no longer
> dominates. Women are manifestly in positions of leadership;
> there were no women partners in the twelve largest firms in
> 1950.  The members of the fourteen largest firms in 1999
> come from all over the globe.
>     But something has been lost as well.  Where are the
> seasoned lawyers with the moral clarity....?  Where are the
> lawyer-statesmen of an earlier generation who exalted our
> profession?

Carl M Sapers, Fifty Years of Large-Firm Practice in Boston: From moral clarity to the water's edge of criminality?  <u>Legal</u> <u>Chowder</u> R. Kass. Ed.) at 73 (MCLE 2002)

The historical background, of course, is just that, background, nothing more.  It is the metes and bounds of Rule 9011 that delimit the propriety of the sanctions imposed here. It is to that matter that the Court now turns.

**1. Ablitt**

"The person signing, filing, submitting, or advocating a document has a **nondelegable** responsibility to the court, and in most situations is the person to be sanctioned for a violation. Absent exceptional circumstances, **a law firm is to be held also responsible** when . . . one of its partners, associates, or employees is determined to have violated the rule."  Advisory Committee Notes to the 1993 amendments to Fed. R. Civ. P. 11 (emphasis supplied).  Rule 9011(b) requires "an inquiry reasonable under the circumstances."  "[W]hat constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information underlying the pleading, motion,

14

or other paper; ... or whether he depended on forwarding counsel or another member of the bar." Advisory Committee Notes to the 1983 amendments to Fed. R. Civ. P. 11.

The Bankruptcy Court was well aware of these principles, but nevertheless, in these circumstances rejected Ablitt's argument that it was entitled to rely, without further inquiry, on information supplied by its client. The Bankruptcy Court carefully explained that the Ablitt firm previously had commenced foreclosure proceedings and taken action against Nosek with respect to this same property on behalf of Wells Fargo as trustee, not Ameriquest. "So the question becomes whether a firm should be permitted to rely on representations of its client without reviewing its own files." Order at 14. The Bankruptcy Court answered in the negative. "The firm cannot shield itself from its institutional knowledge." Id.

Ablitt attacks the Bankruptcy Court's reasoning. Ablitt notes that its attorneys had no actual knowledge of the prior foreclosure when it filed its papers in the bankruptcy case, Ablitt Mem. at 21-22 [Doc. No. 14]; that none of its attorneys were individually sanctioned, id. at 22, and that it relied on Ameriquest's national counsel, Buchalter, as well as Ameriquest itself, in making the misstatements at issue. Id. at 14.

Ablitt also contends that it is common for distressed mortgages to be sold back to their originators. Ablitt contends that mortgages are routinely sold through asset-purchase agreements months before an assignment is executed, much less

15

recorded. Based on these commercial realities, Ablitt argues there was no reason for it to assume that an earlier filing would be more accurate than a current representation from the client. Ablitt Mem. at 21 [Doc. No. 14]. Thus, Ablitt argues that its reliance on Ameriquest was reasonable under the circumstances, and claims that this is all that Rule 11 requires, citing Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1329 (2d Cir. 1995) ("attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable") (internal quotations omitted).

The order of the Bankruptcy Court ably disposes of each of these arguments. The associates were not sanctioned because they were just following orders and were not responsible for the firm's institutional memory. Order at 14. It is in Ablitt's utter disregard of its own internal files that the actionable violation of Rule 9011 is to be found. Surely, had the Ablitt firm reviewed its own files, it would have been on inquiry notice that more was required than an uncritical acceptance of Ameriquest's statements. Those statements simply were not "objectively reasonable," standing alone, in light of the prior foreclosure proceeding on behalf of Wells Fargo.

Accordingly, the imposition of sanctions against the Ablitt firm was well within the discretion of the Bankruptcy Court and will be upheld.

## 2. Buchalter

The Bankruptcy Court held that Buchalter "cannot rely on the representations of its client; it has a responsibility to question and probe to the extent necessary to ensure that it has elicited correct information." Order at 15. Buchalter vigorously disputes the Bankruptcy Court's ruling. The firm argues that, as a technical matter, it did not "present" any papers to the Bankruptcy Court within the meaning of Rule 9011. All it did was prepare the proof of claim, which was signed and submitted by Ameriquest. Buchalter Mem. at 11 [Doc. No. 16]. Further, even if preparation of the form is tantamount to presenting it to the court, the factual contentions at issue had "evidentiary support" insofar as Ameriquest was entitled to seek relief in its own name. Id. Buchalter also argues that it did not violate Bankruptcy Rule 3001 by failing to attach the power of attorney to the proof of claim. Id. at 12-13. As discussed above, a proof of claim without a power of attorney may still be in substantial conformity with the Official Form.

Buchalter contends that the Bankruptcy Court's ruling suffers from hindsight bias. It was not until 2005 that any court required a servicer to identify itself as an authorized agent.[7] See In re Parrish, 326 B.R. 708, 720 (Bankr. N.D. Ohio 2005) (holding that "[a] claimant who is a servicer must, in addition to establishing the rights of the holder, identify

---

[7] This argument is singularly unpersuasive. It is tantamount to saying, "We've been making these misrepresentations for years. Until 2005, no one seemed to care."

17

itself as an authorized agent for the holder"). Moreover, Buchalter argues that there is no deterrent value to the sanctions as it had already changed its filing practices to identify the holder of the mortgage beginning in 2007. Buchalter Mem. at 19. In support of this contention, Buchalter asks the Court to take judicial notice pursuant to Federal Rule of Evidence 201 of three 2007 proofs of claim it made in Bankruptcy Court. Buchalter Request for Judicial Notice [Doc. No. 17]. Because the full extent of Buchalter's filing activity is unknown to the Court, these filings are inconclusive.

Nonetheless, because Buchalter did not present or sign any filings with the Bankruptcy Court, sanctions against the firm are outside the scope of Rule 9011 and must be vacated.

**3. Further proceedings**

"[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true **on the basis of a reasonably diligent inquiry.**" Comment 2 to Supreme Judicial Court Rule 3:07 §3.3 (emphasis supplied) incorporated by reference in D. Mass. Local Rule 83.6 (4)(B). Because there is probable cause to believe the Ablitt firm has violated both the disciplinary rules of this Court and those of the Massachusetts Supreme Judicial Court, it is the duty of this Court to forward a certified copy of the Order of the Bankruptcy Court and this

18

opinion to the Massachusetts Board of Bar Overseers for such action as it deems appropriate in the circumstances.

Being unfamiliar with the attorney disciplinary practices of the Supreme Court of California, this Court will simply forward a certified copy of the order of the Bankruptcy Court and this opinion to that Court, without expressing any opinion thereon, for such action with respect to the Buchalter firm as that Court may deem appropriate.

Finally, as Ameriquest is left facing a substantial sanction due, in part, to the conduct of its counsel, it may well seek contribution from the Ablitt and Buchalter firms; this Court expresses no opinion thereon.

### III. CONCLUSION

Through various filings and statements in open court, Ameriquest misrepresented its role in the case. Although this misrepresentation did not affect the outcome of the case, the Bankruptcy Court did not abuse its discretion in sanctioning Ameriquest.

In the specific circumstances of this case, Ablitt acted unreasonably in relying on Ameriquest for the factual claims in its filings. Therefore, it was not an abuse of discretion for the Bankruptcy Court to sanction Ablitt.

The sanctions against Buchalter and Wells Fargo are *ultra vires* as their conduct was not within the ambit of Rule 9011. Thus, the sanctions against them are vacated.

SO ORDERED.

/s/ William G. Young
William G. Young
District Judge